IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
June 4, 2002 Session Heard at Nashville

## STATE OF TENNESSEE v. RICHARD HALE AUSTIN

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. B-58357     C. Creed McGinley, Judge, by Designation**

---

**No. W1999-00281-SC-DDT-DD - Filed September 16, 2002**

---

The appeal in this capital case arises from the resentencing of Richard Hale Austin, who originally was convicted and sentenced to death in 1977 as an accessory before the fact in the premeditated murder of Julian Watkins. This Court affirmed the conviction and sentence. See State v. Austin, 618 S.W.2d 738 (Tenn. 1981), cert. denied, 454 U.S. 1128 (1981). In 1997 the Sixth Circuit Court of Appeals granted habeas corpus relief as to Austin's sentence, holding that counsel was ineffective at the penalty phase of the original trial. See Austin v. Bell, 126 F.3d 843 (6th Cir. 1997), cert. denied, 523 U.S. 1079 and 532 U.S. 1088 (1998). Following a resentencing hearing, the jury again imposed a sentence of death, and the Court of Criminal Appeals affirmed. On automatic appeal under Tennessee Code Annotated section 39-13-206(a)(1) (1997), we designated the following issues for oral argument:[1]  1) whether the trial court committed reversible error in excluding certain mitigating evidence; 2) whether the trial court committed reversible error in admitting victim impact evidence; and 3) whether the sentence of death is disproportionate, and all other issues mandated by Tennessee Code Annotated section 39-13-206(c)(1). Having carefully reviewed these issues and the remainder of the issues raised by Austin, we conclude that they do not warrant relief. Accordingly, we affirm the Court of Criminal Appeals in all respects.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed.**

JANICE M. HOLDER, J., delivered the opinion of the court, in which PANEL: FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion.

Frank J. Glankler, Jr. and Robert L. Hutton, Memphis, Tennessee, for the Appellant, Richard Hale Austin.

---

[1]"Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument. . . ." Tenn. R. Sup. Ct. 12.2.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Amy L. Tarkington, Deputy Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

In early 1977 Watkins was an undercover agent investigating illegal gambling at the Golden Cue, Austin's pool hall in Memphis. Based on Watkins' work, indictments were returned against Austin, his wife, and several of his employees and associates, including Terry Lee Casteel. Watkins was to be the principal witness against them. At the resentencing hearing, Casteel testified for the State that Austin was upset about the gambling charges and blamed Watkins.[2] Austin told Casteel, "I need to do something about it. I need to take care of him." Austin eventually hired Jack Charles Blankenship, an escaped convict, to murder Watkins. On the evening of May 22, 1977, Casteel and Blankenship drove to Watkins' house, but Watkins was not at home. Blankenship spent the night in a trailer owned by Austin's wife. The next morning Casteel drove Blankenship to Watkins' automobile body repair shop. Blankenship lured Watkins outside and then fatally shot him in the head, neck, and chest. Casteel and Blankenship returned to the trailer, where Austin paid Blankenship $980 for the murder.[3]

Marilyn Lee Pryor, who worked at the Golden Cue, testified that in early May 1977 Austin commented that Watkins was an "S-O-B, and that he should have his brains shot out." Pryor saw a man fitting Blankenship's description leave the Golden Cue with Austin and Casteel the night before Watkins' murder. The next morning, as Austin and Casteel were leaving the Golden Cue, Austin told Pryor that "they had to take care of some business." When Pryor later told Austin that she had given the police a statement in connection with the murder investigation, he told her that she was a "stupid, cold bitch and that [she] should have been killed, too."

In addition to proof regarding the circumstances of the murder, the State introduced victim impact evidence. Carolyn Watkins-Cupp, Watkins' widow, testified that the victim had been a loving, kind, generous, hard-working man who had been active in his community. Steve Watkins, the youngest of the victim's three sons, testified that he was eight years old at the time of the murder. He described his father as everything to him and as good as anyone can be. Both witnesses testified that Watkins' death had left an emptiness in the family.

The defense tried to create lingering doubt as to Austin's involvement in the murder. The defense theory was that Casteel had hired Blankenship. Levi Haywood, an inmate who had been in

---

[2]Casteel also had testified against Austin in the original trial. At that time Casteel was charged with first degree murder in connection with Watkins' death. He eventually pleaded guilty to second degree murder and received a twenty-year sentence.

[3]Austin had agreed to pay $1000, but he subtracted $20 for the case of beer Blankenship had received the night before the murder.

jail with Casteel in 1977, testified that Casteel told him that Austin was not involved in Watkins' murder. Troy Bullock, a friend of Austin, testified that several days before Watkins' murder Casteel picked up a piece of paper with Blankenship's telephone number on it and stated, "I will take care of this. . . . I'm taking care of [Austin's] business."

The defense called Blankenship, the actual killer, to testify on Austin's behalf.[4] After supporting Austin's innocence for twenty-two years, Blankenship suddenly and surprisingly repudiated his prior statements. Blankenship stated that he had lied in the past and would now tell the truth because he had made his peace with God. Blankenship then testified in detail about the circumstances of the killing and how Austin had recruited and paid him to murder Watkins.

The defense next introduced testimony from employees of the Department of Correction that Austin, who at the time of resentencing was almost sixty years old, was a model prisoner and a man of good character. Austin had only one minor disciplinary write-up in his twenty-two years on death row and had achieved the highest classification level possible based on good behavior. He was a teacher's aide and tutored other inmates for the GED examination. Two retired guards told how Austin had saved their lives during a prison riot in 1985.

Members of Austin's family testified that Austin was the fourth of eight children and was a good pool player. At the time of resentencing, he suffered from diabetes. Despite his long years in prison, Austin remained in close contact with family members who visited him often. His stepdaughter described Austin as kind, generous, and honest.

The last witness for the defense was Dr. Mark Cunningham, a clinical and forensic psychologist, who had evaluated Austin. Dr. Cunningham opined that there was a very high likelihood that Austin would continue to have a good adjustment to incarceration and a low to very low likelihood that he would commit acts of serious violence. Dr. Cunningham also stated that Austin's presence would tend to reduce overall violence in the prison system.

Based on this proof, the jury found that the State had proven beyond a reasonable doubt the following aggravating circumstance: "The defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration." Tenn. Code Ann. § 39-2404(i)(4) (Supp. 1977).[5] In addition, the jury

---

[4] Blankenship, who had pleaded guilty to first degree murder and received a life sentence, did not testify at the original trial.

[5] The State also sought the death penalty based on the aggravating circumstance in Tennessee Code Annotated section 39-2404(i)(6) (Supp. 1977): "The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." The jury did not find this aggravating circumstance.

found that the State had proven that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.[6]  As a result, the jury sentenced Austin to death.

## EXCLUSION OF MITIGATING EVIDENCE

Austin challenges the trial court's exclusion of certain mitigating evidence during the resentencing hearing.  Specifically, Austin contends that the trial court erroneously excluded the following evidence:  1) a vice squad report requesting indictments based on Watkins' undercover gambling investigation; 2) testimony of Terry Casteel that Austin had reported his automobile stolen while Casteel was using it; 3) testimony of Reverend Joe Ingle about Austin's actions during a 1985 prison riot; and 4) a 1995 deposition of Jack Charles Blankenship.

The admissibility of evidence at the resentencing hearing in this case is governed primarily by Tennessee Code Annotated section 39-2404(c) (Supp. 1977) [now section 39-13-204(c) (Supp. 2001)],[7] which provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors.  Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted.  However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the state of Tennessee.

Under this statute, any evidence relevant to the circumstances of the murder, the aggravating circumstances of the murder, or the mitigating circumstances, which has probative value in the determination of punishment, is admissible.  State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995). Because the exclusion of mitigating evidence potentially undermines the reliability of the sentencing determination, we review any error in failing to admit such evidence under a constitutional harmless error standard.  See State v. Cauthern, 967 S.W.2d 726, 739 (Tenn. 1998).

---

[6]Austin was not entitled to the "beyond a reasonable doubt" weighing standard because the offense was committed before the death penalty statute was amended in 1989.  Any error in this regard, however, inured to Austin's benefit.  See State v. Bush, 942 S.W.2d 489, 506 n.10 (Tenn. 1997).

[7]The sentencing law at the time the murder was committed is the applicable law.  State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994).

### Vice Squad Report

During the testimony of Floyd Cupp, the defense sought to introduce a vice squad report, dated March 31, 1977, requesting indictments on several people based on Watkins' undercover gambling investigation. Cupp was a retired Memphis police officer who had worked with Watkins during the undercover gambling investigation and had prepared the report. The defense argued that the report was evidence of other persons who had a motive for killing Watkins. The trial court refused to admit the report on the ground that it was hearsay.

Contrary to the ruling of the trial court, hearsay is admissible in a capital sentencing hearing. See State v. Odom, 928 S.W.2d 18, 28 (Tenn. 1996). The Rules of Evidence should not be applied to preclude the admission of relevant evidence in a capital sentencing hearing. See State v. Sims, 45 S.W.3d 1, 14 (Tenn. 2001). Because Austin did not offer any evidence linking any of the other persons named in the vice squad report to Watkins' murder, the report was of negligible probative value. However, it was not irrelevant. Evidence concerning other persons who had a motive to kill Watkins was relevant to support residual doubt as a nonstatutory mitigating circumstance. The trial court allowed defense counsel to cross-examine Cupp concerning the names contained in the report. If testimony concerning the content of the vice squad report was relevant enough to be admissible, then the report was admissible as well. We therefore conclude that the trial court erred in excluding the report. However, because the essence of the vice squad report was admitted through Cupp's testimony, the error in excluding the report itself was harmless beyond a reasonable doubt. See Cauthern, 967 S.W.2d at 739.

### Testimony of Terry Casteel

Terry Casteel testified that he had used Austin's Cadillac to drive Marilyn Pryor to her home in Greenwood, Mississippi, two or three days after Watkins' murder. On cross-examination, defense counsel asked Casteel if he knew that Austin had reported to the Memphis Police Department that the automobile had been stolen. After Casteel answered that he had been told that Austin had made the report, the trial court sustained the State's hearsay objection. Austin complains that the trial court erred by excluding as hearsay Casteel's acknowledgment that Austin reported his automobile stolen.

The defense theory was that Austin would not have alerted the police to look for the automobile while Casteel was using it if the two men had been accomplices in Watkins' murder. Evidence that Austin reported his automobile stolen therefore was relevant to rebut proof that Austin had orchestrated Watkins' murder with Casteel and Blankenship. As we indicated above, hearsay is admissible in a capital sentencing hearing. Therefore, the trial court erred in sustaining the State's hearsay objection. We conclude, however, that any error in failing to admit Casteel's statement was harmless beyond a reasonable doubt. The jury was unlikely to find that Austin's reporting the automobile stolen several days after the shooting rebutted the overwhelming evidence establishing that Austin and Casteel were accomplices in Watkins' murder.

**Testimony of Reverend Joe Ingle**

As mitigation proof, Austin presented the videotape depositions of two retired prison guards, Hardin Green and John Owen, describing Austin's actions during a 1985 prison riot. Both Green and Owen testified that Austin protected them and five other guards from inmates in the general population who had started a riot and were trying to break into the death-row unit. Later, Austin presented the testimony of Reverend Joe Ingle, a prison minister who had had a pastoral relationship with Austin for twenty-two years. After relating information about Austin, Ingle was asked to specifically recall the 1985 prison riot. Ingle explained that his knowledge of the riot was gained from conversations with John Owen. When Ingle began to relate what Owen had told him, the State objected. The trial court sustained the objection, finding that Ingle's testimony was hearsay[8] and duplicated Owen's testimony.

As a preliminary matter, we note that Austin failed to make an offer of proof concerning Ingle's testimony. Under similar circumstances, we have held that the issue is waived. See State v. Stout, 46 S.W.3d 689, 704 n.10 (Tenn. 2001); see also Sims, 45 S.W.3d at 15. Because Ingle's testimony about Austin's actions during the riot presumably would have mirrored Owen's testimony, we conclude that the record is adequate for review. We will therefore address the issue on its merits.

Citing Skipper v. South Carolina, 476 U.S. 1 (1986), Austin contends that Ingle's testimony was not cumulative because Ingle was the only live witness presented to testify regarding Austin's actions during the riot. In Skipper, the United States Supreme Court determined that mitigating testimony about the defendant's good behavior in prison was not cumulative because it came from disinterested witnesses such as jailers while the earlier evidence had come from the defendant and his family and was the type of evidence a jury would naturally discount as self-serving. 476 U.S. at 7-8. Unlike Skipper, the jury in Austin's case already had heard the testimony of two disinterested witnesses – Green and Owen – concerning the mitigating evidence. Moreover, the excluded testimony was based on second-hand knowledge, not first-hand observation as in Skipper. Ingle's testimony was no less cumulative because the prior testimony was presented by videotape depositions.

A finding that mitigating evidence is cumulative, however, does not make such evidence inadmissible. As we have indicated, the Rules of Evidence do not govern the admissibility of evidence under Tennessee Code Annotated section 39-2404(c) (Supp. 1977) [now section 39-13-204(c) (Supp. 2001)]. See Sims, 45 S.W.3d at 14. We have found error when a trial court excluded mitigating evidence on the ground that it was cumulative. See Cauthern, 967 S.W.2d at 738. In that case, the trial court excluded a letter written to the defendant from his eight-year-old son expressing love and support. In light of the principles expressed in section 39-13-204(c), we concluded that the trial court erred in excluding the letter. 967 S.W.2d at 738. We further held, however, that the error was harmless beyond a reasonable doubt because the essence of the evidence was presented to the jury in other forms. Id. at 739.

---

[8]As we previously noted, hearsay is admissible in a capital sentencing hearing.

In the present case, the excluded evidence was more than cumulative – it was duplicative. Ingle was not an eyewitness to Austin's actions during the prison riot. Ingle could only repeat what Owen had told him. With no offer of proof to demonstrate otherwise, we must assume that Ingle's testimony would have consisted of hearsay duplicating Owen's previous testimony. Notwithstanding the principles expressed in § 39-2404(c) (Supp. 1977) [now § 39-13-204(c)], a trial court still retains some discretion in controlling the presentation of proof in a capital sentencing hearing within the confines of constitutional requirements. See Sims, 45 S.W.3d at 14. Given the duplicative nature of Ingle's hearsay testimony, we are unable to conclude that the trial court erred in excluding the evidence. Furthermore, even if Ingle's testimony should have been admitted, any error in excluding the testimony was harmless beyond a reasonable doubt. See Cauthern, 967 S.W.2d at 739.

### Deposition of Jack Charles Blankenship

In a deposition taken in 1995 for Austin's federal habeas corpus proceedings, Blankenship denied that Austin had any involvement in Watkins' murder. During the resentencing hearing, however, Blankenship repudiated his prior statements. To counter Blankenship's testimony, the defense cross-examined Blankenship concerning his prior statements and then sought to introduce as substantive evidence the 1995 deposition of Blankenship in its entirety. The trial court denied the request but permitted the deposition to be marked as an exhibit for the limited purpose of impeaching the witness. The court instructed the jury accordingly.

As we have previously stated, hearsay is admissible in a capital sentencing hearing. Blankenship's 1995 deposition was relevant to rebut the aggravating circumstance that the murder was committed for remuneration and to support residual doubt as a nonstatutory mitigating circumstance. Therefore, the trial court erred in not allowing the deposition to be used as substantive evidence. Although the trial court did not completely exclude the deposition, the limitation on the jury's consideration of the deposition potentially undermined the reliability of the sentencing determination and is, therefore, an error of constitutional magnitude. Cf. Cauthern, 967 S.W.2d at 739.

Austin contends that the error was not harmless for several reasons. First, he argues that the limitation on the jury's consideration of the deposition cannot be harmless beyond a reasonable doubt because the deposition was relevant to rebut the only aggravating circumstance. Austin has presented no authority and we have found no support for a per se reversible error rule in cases where only one aggravating circumstance exists. Second, Austin contends that the only other proof supporting the aggravating circumstance – the testimony of Terry Casteel – lacked credibility. Contrary to Austin's assertion, overwhelming evidence, including the testimony of Marilyn Pryor corroborating Casteel's testimony, supported the aggravating circumstance. Finally, Austin asserts that the error cannot be harmless because Blankenship's testimony in the deposition was "compelling and unequivocal." The jury was in the best position to assess the credibility of Blankenship. If, despite vigorous cross-examination, the jury believed Blankenship's recantation of his prior deposition testimony, it is unlikely that reading the entire deposition into evidence would have produced a different result.

In a similar case, we found the exclusion of such mitigating evidence to be harmless beyond a reasonable doubt. See Stout, 46 S.W.3d at 705. In Stout, the defendant sought to introduce the testimony of two accomplices in an effort to show that his own involvement in the murder was minor. The defendant also sought to call a chaplain to testify about a gang practice of blaming crimes on former members. Although we concluded that the trial court erred in excluding the proposed mitigating evidence, we held that the error was harmless beyond a reasonable doubt. The testimony of the accomplices was of dubious value because they had testified during the guilt phase that the defendant led the offenses and shot the victim. Id. Likewise, other evidence was presented regarding the defendant's theory that he was falsely accused by gang members, and this evidence obviously was rejected by the jury. Id. Like the evidence in Stout, the excluded evidence in this case was of dubious value. Blankenship testified at the resentencing hearing that Austin hired him to kill Watkins. The 1995 deposition proclaiming Austin's innocence likely would not have been very persuasive to the jury since Blankenship fully admitted that the deposition testimony was false. Additionally, just as in Stout, Austin presented other proof to support his residual doubt theory, and the proof obviously was rejected by the jury.

In State v. Hartman, 42 S.W.3d 44 (Tenn. 2001), we reversed the sentence because of a combination of errors: the exclusion of evidence relevant to residual doubt as a mitigating circumstance and insufficient evidence to support one of the aggravating circumstances. Id. at 59. The present case is distinguishable from Hartman. Unlike Hartman, the jury in this case did not rely on an invalid aggravating circumstance. Moreover, the residual doubt evidence in this case was not completely excluded. Substantial portions of the deposition were read to the jury during Blankenship's testimony. The entire deposition was introduced as an exhibit. The jury was precluded only from considering the deposition as substantive evidence.

The practical effect of using the deposition for impeachment purposes was not much different than introducing it as substantive evidence. The jury was presented with two theories: either Austin hired Blankenship to commit the murder or Austin did not. Rejection of the first theory would necessarily mean acceptance of the second. If the jury had found that the deposition impeached Blankenship's credibility, then the jury would not have believed Blankenship's testimony at the resentencing hearing and would have found, instead, that Austin did not hire Blankenship to murder Watkins. It is not likely that the result would have been any different if the deposition had been introduced as substantive evidence. The limitation on the jury's consideration of the deposition did not affect the jury's decision to Austin's prejudice and was, therefore, harmless beyond a reasonable doubt.

## VICTIM IMPACT EVIDENCE

The trial court admitted victim impact evidence from Carolyn Watkins-Cupp, the victim's widow, and Steve Watkins, one of the victim's sons. Austin raises three arguments regarding the victim impact evidence. First, Austin contends that the evidence was unduly prejudicial and cumulative. Second, he asserts that the trial court failed to follow the procedure set out in State v.

Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998). Finally, he claims that the prosecutor's closing argument regarding the function of victim impact evidence was improper under Nesbit.

Victim impact evidence and prosecutorial argument on the evidence are not barred by the Tennessee Constitution or the Constitution of the United States. See Nesbit, 978 S.W.2d at 889. However, not all victim impact evidence is admissible. Victim impact evidence may not be introduced if 1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or 2) its probative value is substantially outweighed by its prejudicial impact. See id. at 891. Generally, victim impact evidence should be limited to information which provides "a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Id.

The victim impact evidence about which Austin complains was limited to the victim's role as husband and father and to the loss suffered by the victim's immediate family. This evidence is of the nature contemplated by Nesbit and is similar to the victim impact evidence found appropriate in State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999). We conclude that the victim impact evidence in this case was not cumulative or unduly prejudicial and that its probative value was not substantially outweighed by its prejudicial impact.

In Nesbit, we established the following procedural guidelines for the admission of victim impact evidence: 1) the State must notify the trial court of its intent to produce victim impact evidence; 2) upon receiving notification, the trial court must hold a hearing outside of the presence of the jury to determine the admissibility of the evidence; and 3) the victim impact evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record. 978 S.W.2d at 891. Austin asserts that this procedure is constitutional in nature. Although the admission of unduly prejudicial victim impact evidence may implicate due process concerns, the procedure established in Nesbit is not constitutionally mandated. This procedure merely enables the trial court to adequately supervise the admission of victim impact evidence. See id.

In compliance with the procedural requirement established in Nesbit, the State in this case notified the trial court of its intent to introduce victim impact evidence, and the trial court conducted a jury-out hearing to determine the admissibility of the evidence. However, Nesbit's third requirement was not fulfilled when the trial court allowed the victim impact testimony of Watkins' widow to be presented before any proof of an aggravating circumstance existed in the record. Requiring the existence in the record of proof of an aggravating circumstance before the presentation of victim impact evidence lessens the risk that the admission of unduly prejudicial victim impact evidence will render the trial fundamentally unfair. If unduly prejudicial victim impact evidence is admitted first, then the danger exists that the jury may not fairly consider the other evidence presented at the sentencing hearing. Because the victim impact testimony of Watkins' widow was not unduly prejudicial, we conclude that the variance from the procedure established in Nesbit did not affect the

result of the resentencing hearing on the merits and, therefore, was harmless error.  See Tenn. R. Crim. P. 52(a).

In his final challenge to the victim impact evidence, Austin contends that the prosecutor improperly told the jury how to weigh the evidence.  In Nesbit, we cautioned that victim impact evidence "does not carry the force and effect of an aggravating circumstance in the sentencing calculation."  978 S.W.2d at 894.  We held that the prosecutor in that case erroneously characterized the victim impact evidence as an aggravating circumstance to weigh against mitigation proof.  Id.  In the present case, the prosecutor specifically told the jury that they could only weigh aggravating and mitigating circumstances.  The prosecutor's comment that they were also required to consider "the impact of this crime" did not improperly characterize the victim impact evidence as an aggravating circumstance.  Accordingly, we find no error in the prosecutor's closing argument.

## PROPORTIONALITY REVIEW

We are bound by statute to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (1997).  Having thoroughly reviewed the record, we find that the sentence of death was not imposed in an arbitrary fashion.  We conclude that the State presented sufficient proof to uphold the jury's finding of the aggravating circumstance in Tennessee Code Annotated section 39-2404(i)(4) (Supp. 1977):  "The defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration."  This aggravating circumstance was amply supported by the testimony of Casteel and Blankenship that Austin hired Blankenship to murder Watkins.  We further hold that the evidence supports the jury's finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.  Contrary to Austin's assertion, a reasonable jury could have found that the proffered mitigating circumstances of residual doubt, relative culpability for the offense, and positive prison behavior were outweighed by the aggravating circumstance.

-10-

We next determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. See Tenn. Code Ann. § 39-13-206(c)(1)(D) (1997). We are mindful of the following principles applicable to proportionality review:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in choosing and comparing cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. Id. In comparing defendants, we consider the following traits: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. Id.

In the present case, the victim was shot execution-style in the head and then several more times in the neck and chest. The motive for the killing was to retaliate against the victim for his undercover work exposing Austin's illegal gambling. The murder clearly was premeditated in that Austin hired another person to commit the murder.

Austin, a white male, was thirty-seven years old at the time of the murder and almost sixty years old at the time of the resentencing hearing. A psychologist testified for the defense that an inmate of Austin's age was exceedingly unlikely to commit acts of serious violence in prison. Austin presented mitigating evidence attesting to his positive contributions to the prison community while incarcerated and his efforts to ensure the safety of prison guards during a prison riot. No evidence of prior criminal history was presented at the resentencing hearing.[9] Austin's role in the murder was significant in that he instigated the plan to murder the victim and hired the actual killer. No evidence was presented to show that Austin cooperated with the authorities or showed any remorse for the

_____

[9] The trial judge's report under Tenn. Sup. Ct. R. 12 reflects a 1966 larceny conviction and a 1961 robbery conviction.

murder.  Considering the nature of the crime and the defendant, we conclude that this murder places Austin into the class of defendants for whom the death penalty is an appropriate punishment.

Austin contends that his sentence is comparatively disproportionate because his co-defendants, Casteel and Blankenship, received lesser sentences.  Statutory proportionality review involves a comparison only with cases in which a capital sentencing hearing was actually conducted.  See State v. Bland, 958 S.W.2d 651, 666 (Tenn. 1997).  Because neither Blankenship nor Casteel was subjected to capital proceedings, their cases are not similar cases for purposes of proportionality review.

Citing Nuthill v. State, 30 Tenn. (11 Hum.) 247 (1850), Austin argues that he could not receive a greater sentence than Blankenship as a matter of law because a defendant convicted as an accessory before the fact cannot be sentenced to death if the principal received a life sentence. Austin's reliance on Nuthill is misplaced.  At the time of the offense in this case, Tennessee Code Annotated section 39-2407 (Supp. 1977) expressly provided that the punishment imposed upon an accessory before the fact of murder in the first degree did not depend on the sentence imposed on the principal.

Austin also asserts that he has not found a case in Tennessee history in which an accessory before the fact received a sentence of death and the principal was sentenced to life.  Tennessee law no longer distinguishes between accessory before the fact and the principal.  In three cases, we have upheld the death penalty for the person who instigated the murder – the equivalent of accessory before the fact – when the actual killer received a lesser sentence.  See State v. Stevens, ___ S.W.3d ___ (Tenn. 2002); State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994); State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994).[10]

Based upon an exhaustive review of the record and Rule 12 reports from trial judges in trials for first degree murder, we conclude that the present case is proportionate when compared to other murders for hire in which the death penalty was imposed.  See Stevens, ___ S.W.3d ___ (defendant hired acquaintance to murder wife and mother-in-law); Hutchison, 898 S.W.2d 161 (defendant hired several people to drown victim for insurance proceeds); Stephenson, 878 S.W.2d 530 (defendant hired acquaintance to kill wife); State v. Wilcoxson, 772 S.W.2d 33 (Tenn. 1989) (defendant, who was hired by wife of victim to kill her husband, procured brother to commit offense);[11] State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988) (defendant hired co-defendant to kill husband); State v.

_____

[10]In Stephenson, the case was remanded for resentencing due to an instructional error during the sentencing phase of the trial.  878 S.W.2d at 556.  On remand, the parties reached an agreement to reduce the sentence to life without the possibility of parole.  On appeal, we held that the life without parole sentence was illegal because it was not a legal sentencing option at the time of the offense.  Stephenson v. Carlton, 28 S.W.3d 910, 912 (Tenn. 2000).  A new sentencing hearing has not been held.

[11]Upon post-conviction review Wilcoxson was granted relief as to his sentence based on ineffective assistance of counsel.  See Wilcoxson v. State, 22 S.W.3d 289 (Tenn. Crim. App. 1999).  A new sentencing hearing has not been held.

Coker, 746 S.W.2d 167 (Tenn. 1987) (defendant arranged for murder of paramour's husband).[12]  In two of these cases, murder for hire was the sole aggravating circumstance.  See Hutchison, 898 S.W.2d 161, Stephenson, 878 S.W.2d 530.  After reviewing these cases, and many others not cited, we conclude that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

We have considered Austin's argument that the only Tennessee cases similar to his are those of William Groseclose and Ronald Rickman.  Groseclose hired Rickman and another man to kill his wife.  On direct appeal, we found the death sentences to be proportionate.  State v. Groseclose, 615 S.W.2d 142, 150-51 (Tenn. 1981).  In federal habeas corpus proceedings, the convictions and sentences were reversed based on ineffective assistance of counsel.  See Groseclose v. Bell, 130 F.3d 1161 (6th Cir. 1997); Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997).  On retrial, the jury again convicted Groseclose and Rickman of first degree murder but sentenced them to life imprisonment.  The Rule 12 report reflects that the trial judge was of the opinion that the jury did not impose the death penalty because of the defendants' twenty years of good behavior in prison.  As we have stated many times, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate."  State v. Keen, 31 S.W.3d 196, 222 (Tenn. 2000) (citations omitted).  We recently affirmed the sentence of death in a resentencing case involving similar mitigating evidence of good behavior in prison.  See Terry v. State, 46 S.W.3d 147 (Tenn. 2001).  Given the numerous similar cases in which the death penalty has been imposed, we are unable to conclude that the sentence of death imposed by the jury in this case represents an aberrant sentence.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

Having carefully considered the issues raised by Austin regarding the exclusion of mitigating evidence and the admission of victim impact evidence, we hold that these issues are without merit or do not require reversal.  Having reviewed all of the other issues raised by Austin, we conclude that they do not warrant relief.  With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals.  Relevant portions of that opinion are incorporated herein and are attached as an appendix.  The defendant's sentence of death is affirmed and shall be carried out on the 23rd day of January, 2003, unless otherwise ordered by this Court or proper authority.  It

---

[12]Upon post-conviction review Coker was granted relief as to his sentence based on ineffective assistance of counsel.  At a bench trial on resentencing, Coker was sentenced to life imprisonment.  See Coker v. State, No. 01C01-9804-CC-00152 (Tenn. Crim. App. 1999).

appearing that defendant Richard Hale Austin is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

# **APPENDIX**

(Excerpts from the Court of Criminal Appeals' Decision)

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
January 9, 2001 Session

## STATE OF TENNESSEE v. RICHARD HALE AUSTIN

### Direct Appeal from the Criminal Court for Shelby County
### No. B-58357 C. Creed McGinley, Judge, by designation

### No. W1999-00281-CCA-R3-DD - Filed March 6, 2001

In 1977, Richard Hale Austin was found guilty by a Shelby County jury of accessory before the fact to the first degree murder of Julian Watkins. Austin's conviction stemmed from his role in commissioning the murder of Watkins, a reserve deputy sheriff. The jury subsequently found the presence of aggravating factor (i)(4), murder for remuneration, and imposed a sentence of death. In 1997, Austin was granted habeas corpus relief in the form of a new sentencing hearing by the Sixth Circuit Court of Appeals. At the re-sentencing hearing, twenty-two years after his original trial, a jury again found the presence of the (i)(4) aggravating factor and again imposed a sentence of death. It is from this sentencing decision that Austin appeals. In this appeal, Austin presents numerous issues for our review, including (1) the disqualification of the Tennessee Supreme Court; (2) challenges to the selection of various jurors; (3) the admission and exclusion of evidence; (4) the introduction of victim impact evidence; (5) prosecutorial misconduct during closing argument; (6) the propriety of the jury instructions; (7) whether application of the (i)(4) aggravator violates State v. Middlebrooks; (8) prejudice due to the delay in imposing a sentence of death; (9) the constitutionality of Tennessee's death penalty statutes; and (10) whether the jury imposed a proportionate sentence. After a careful review of the record, we affirm the imposition of the sentence of death.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Frank J. Glankler, Jr. and Robert L. Hutton, Memphis, Tennessee, for the Appellant, Richard Hale Austin.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Amy L. Tarkington, Assistant Attorney General, William L. Gibbons, District Attorney General, and John Campbell and Thomas Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**[Deleted: Factual Background and Proof at the Re-Sentencing Hearing]**

**I.**
**Disqualification of Tennessee Supreme Court and/or State Attorney General**

During the pendency of the re-sentencing hearing, the Appellant filed, in the Shelby County Criminal Court, a "Motion to Disqualify Supreme Court and/or Attorney General from Future Proceedings in this Cause." The substance of the motion was based upon the Appellant's allegation that the Tennessee Supreme Court's constitutional directive to appoint the Attorney General results in a biased tribunal and violates the constitutionally mandated separation of powers. See TENN CONST. Art. VI, sec. 5; TENN. CODE ANN. § 8-6-101 (1993). Contemporaneously, the Appellant issued subpoenas to the justices of the supreme court; Court of Criminal Appeals Judge Paul G. Summers;[13] Mr. Charles Ferrell, Director, Administrative Office of the Courts; and Attorney General Knox Walkup. The trial court denied the motion and quashed the subpoenas, finding that the motion was premature. This court denied the Appellant's application for extraordinary review pursuant to Tenn. R. App. P. 10, holding that none of the persons subpoenaed had any involvement in the case at the trial level. See State v. Richard Hale Austin, No. 02C01-9811-CR-00341 (Tenn. Crim. App. at Jackson, Nov. 9, 1998). The Tennessee Supreme Court denied the Appellant's application for extraordinary appeal from this court's order. See State v. Richard Hale Austin, No. 02S01-9811-CR-00112 (Tenn. at Jackson, Feb. 1, 1999).

Following the reimposition of the death penalty, the Appellant filed a motion in this court seeking leave to issue subpoenas and take testimony, or, in the alternative, to remand the case to the trial court to take testimony. In his motion, the Appellant asserted that through the issuance of subpoenas he "would be able to develop" the "political interconnectedness" "of the Tennessee Supreme Court and the present Attorney General, Honorable Paul Summers." He alleged that the present Attorney General is a "favorite son" of the supreme court and a "de facto employee" "beholden to the court." Essentially, the Appellant argued that the circumstances surrounding the appointment of Paul Summers as Attorney General are crucial "to proving a due process violation as to the lack of an unbiased and impartial Supreme Court." This court denied the Appellant's motion, finding that this court was without jurisdiction to entertain the motion. See State v. Richard Hale Austin, No. W1999-00281-CCA-R3-PD (Tenn. Crim. App. at Jackson, Dec. 3, 1999). Additionally, this court noted that "a claim involving disqualification or recusal of the Tennessee Supreme Court" may not appropriately be considered by either the trial court or this court. Id. (citing Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a); State v. Benson, 973 S.W.2d 202 (Tenn. 1998) (allegations of judge's impartiality or bias concerning a party or a party's lawyer must be brought to the attention of the judge(s) so challenged)).

---

[13]The Appellant's subpoenas were issued on September 29, 1998. The present Attorney General, Paul G. Summers, was not sworn into office until January 1999.

The Appellant now complains of the prior rulings of the trial court and this court. Specifically, he alleges that had he been permitted to develop proof at the hearing before the trial court, he

> would have been able to demonstrate that the Supreme Court instructed Mr. Knox Walkup, who at the time was Attorney General, to resign, telling him that he would not be reappointed. Furthermore, the proof would have demonstrated that the Court had previously made a private agreement to appoint Mr. Paul Summers as the next Attorney General, notwithstanding the fact that the Supreme Court publicly asserted it had a purportedly neutral selection process to select a new Attorney General. All of these facts demonstrate the political interconnectedness of the Supreme Court and the Attorney General.

As determined by prior panels of this court and by the trial court in this matter, this court is unable to undertake review of the Appellant's challenge. Although the Appellant raises constitutional claims against Tennessee's method of selecting the Attorney General, in essence, the Appellant seeks recusal of the <u>current</u> Justices of the Tennessee Supreme Court based on their "favoritism" toward <u>current</u> Attorney General Summers. Indeed, his argument before this court, as in his prior motions, appears to assert approval of former Attorney General Walkup. Thus, this court will treat this issue as one addressing the supreme court's recusal and not as a constitutional challenge to the method of appointment.

The right to a fair trial before an impartial tribunal is a fundamental constitutional right. <u>See Benson</u>, 973 S.W.2d at 205 (citing <u>Chapman v. California</u>, 386 U.S. 18, 23 n. 8, 87 S. Ct. 824, 828 n. 8 (1967) (internal citations omitted)). Article VI, § 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme of Inferior Courts shall preside on the trial of any cause in the event of which he may be interested." <u>Benson</u>, 973 S.W.2d at 205. The purpose of this constitutional provision is to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality, or favor. <u>Id</u>. (citing <u>Chumbley v. People's Bank & Trust Co.</u>, 57 S.W.2d 787, 788 (Tenn. 1933)). A judge's determination of whether he or she will disqualify him or herself from sitting in a case is a matter <u>within that judge's</u> discretion. <u>See generally Kinard v. Kinard</u>, 986 S.W.2d 220 (Tenn. App. 1998); <u>Young v. Young</u>, 971 S.W.2d 386 (Tenn. App. 1997); <u>State v. Connors</u>, 995 S.W.2d 146 (Tenn. Crim. App. 1995); <u>Wiseman v. Spaulding</u>, 573 S.W.2d 490, 493 (Tenn. App. 1978)(citing <u>State of Tenn. ex rel. Phillips v. Henderson, Warden</u>, 423 S.W.2d 489 (Tenn. 1968)). Thus, the Appellant's motion must be brought to the attention of the justices whom he has challenged. <u>See generally</u> Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a). <u>Cf</u>. <u>Holder v. Tennessee Judicial Selection Commission</u>, 937 S.W.2d 877, 879 (Tenn. 1996) (justices disqualified themselves prior to hearing); <u>Pierce v. Tharp</u>, 461 S.W.2d 950, 953-54 (Tenn. 1970), cert. denied, 402 U.S. 929, 91 S. Ct. 1527 (1971) (motion to recuse justices should have been brought after certiorari was granted but before argument heard); <u>Chumbley v. People's Bank & Trust Co.</u>, 57 S.W.2d at 787 (supreme court justices determined propriety of own recusal); <u>Hooker v. Sundquist</u>, No. 01A01-9709-CH-00533 (Tenn. at

Nashville, Feb. 16, 1999) (motion to recuse justices filed after application for permission to appeal filed).

Neither the trial court nor this court has the prerogative or authority to arrive at any conclusion regarding the alleged impartiality or bias of each challenged justice. The Appellant has yet to present the motion to the supreme court. He is not yet precluded from presenting his challenge to the court and may properly file his motion after the court has accepted review of his case. Although no precise procedure is contemplated by the Canons nor established through case law, the accepted practice when seeking the disqualification of a judge is through the filing of a motion for recusal with supporting affidavits of prejudice. See generally 46 AM.. JUR.2D *Judges* §§ 194- 214 (1994 & Supp. 2000). There is no authority for the issuance of subpoenas, or any other discovery procedures, in support of one's motion to disqualify a judge. Id.

Accordingly, for the reasons set forth herein, we decline the Appellant's invitation to disqualify the justices of the Tennessee Supreme Court from participation in the review of his appeal. The Tennessee Supreme Court is the proper court before whom the Appellant's complaint should to be lodged.

## II.
## Jury Selection Process

### A. Individual Voir Dire

Immediately prior to the Appellant's trial, the Shelby County case of State v. William Groseclose and Ronald Rickman was retried. The Groseclose/Rickman case was, similarly, a twenty-two-year old retrial of a murder for hire. On retrial, both Groseclose and Rickman received life sentences. The "new" sentences were reported by the media as well as the public's adverse response to the more lenient sentences. Based on these events, counsel requested individual voir dire of prospective jurors for the purpose of determining the impact of any collateral consequences stemming from the Groseclose/Rickman verdicts. The trial court denied the request. The Appellant now contends that his rights to an impartial jury and due process were violated as guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution.

The prevailing practice is to examine jurors collectively. State v. Jefferson, 529 S.W.2d 674, 681 (Tenn. 1975); State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); State v. Hopper, 695 S.W.2d 530, 539 (Tenn. Crim. App. 1985). Indeed, even in a capital case, there is no requirement that death qualification of a capital jury must be conducted by individual, sequestered voir dire. State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1999) (citing State v. Smith, 857 S.W.2d 1, 19 (Tenn.), cert. denied, 510 U.S. 996, 114 S. Ct. 561 (1993); State v. Porterfield, 746 S.W.2d 441, 447 (Tenn.), cert. denied, 486 U.S. 1017, 108 S. Ct. 1756 (1988)). Moreover, as a general rule, it is within the trial court's discretion to allow individual voir dire of prospective jurors. Stephenson, 878 S.W.2d at 540 (citing State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S. Ct. 1339 (1994); State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct.

1368 (1993)). The ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743 (1995); Howell, 868 S.W.2d at 247, and "[i]ndividual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Howell, 868 S.W.2d at 247; Harris, 839 S.W.2d at 65 (citing Porterfield, 746 S.W.2d at 447). The mere fact that prospective jurors know something about a case at the time of impaneling is not unusual, nor is it sufficient to invoke individual voir dire, where the trial court takes the necessary steps to ensure that the accused receives a fair trial by a panel of impartial and indifferent jurors.

The record does not reflect that the re-sentencing of the Appellant was going to be a high profile case. Indeed, the record reveals that only one juror had to be removed for cause because he had already formed an opinion about the case, this juror also being the victim's cousin. Additionally, although defense counsel introduced as exhibits newspaper articles regarding the Groseclose/Rickman re-sentencing, defense counsel failed to question the jurors about the impact of this case on the Appellant's re-sentencing. Irregardless of defense counsel's failure, the media attention paid to the Groseclose/Rickman case is of little import regarding the necessity of individual voir dire in the present case. We cannot conclude that pretrial knowledge of matters arising from unrelated crimes mandates individual voir dire. Cf. State v. Mann, 959 S.W.2d 503, 531 (Tenn. 1997) (Appendix) (jurors do not live in a vacuum). Any concerns which may remain regarding the impact of publicity arising from the Groseclose/Rickman re-sentencing were dispelled by the trial judge's instruction to the venire:

> You must base your verdict only upon the law that is presented here in court. I mean the evidence as presented here in court through witnesses that are placed under oath, exhibits, and the law that I charge you. And the reason I'm touching on that now is that [you] cannot base [your] decision upon what you might have heard somewhere or what you might have read in the newspapers. And the attorneys will touch on this later, but I'm sure each of you understand, that we cannot have our judicial system operate based upon what we've seen or heard or any preconceived ideas.

The jury is presumed to follow the instructions of the court. Accordingly, we cannot conclude that the trial court abused its discretion in denying individual voir dire. See generally Porterfield, 746 S.W.2d at 446-47 (if no prejudicial information is elicited during voir dire and if the jurors assert they can disregard the pretrial publicity, there is no error in denying individual voir dire). This issue is without merit.

### B. Rehabilitation of Jurors

The Appellant next contends that he was denied an impartial jury because the trial court denied the Appellant the opportunity to rehabilitate potential jurors who were excused for cause on motion of the State because of their opposition to the death penalty. Specifically, the Appellant

challenges the removal for cause of Jurors Hilliard, Eslahi, Buffaloe, Massey, Brown, and Corken, and of Alternate Jurors Brooks and Hudson.

Tenn. R. Crim. P. 24(b) gives the trial judge the right to excuse a juror for cause without examination of counsel. State v. Hutchinson, 898 S.W.2d 161, 167 (Tenn. 1994), cert. denied, 516 U.S. 846, 116 S. Ct. 137 (1995) (citing State v. Alley, 776 S.W.2d 506 (Tenn. 1989); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981), cert. denied, 455 U.S. 983, 102 S. Ct. 1491 (1982)). In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985). The Supreme Court further observed that "this standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" Id. However, the trial judge must have the "definite impression" that a prospective juror could not follow the law. Hutchinson, 898 S.W.2d at 167 (citing Wainwright v. Witt, 469 U.S. at 425-26, 105 S. Ct. at 853). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the Appellant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. Alley, 776 S.W.2d at 518.

The challenged removals for cause were based on the following responses by the respective jurors when questioned whether they could "sign [their] name to a verdict sentencing the defendant to death":

> JUROR HILLIARD: No. . . . I don't believe in [the death penalty] . . . . I would stand by my own [personal convictions.]
>
> JUROR ESLAHI: No, sir. . . . That's correct, [I don't believe in the death penalty] . . . I would have to stand by my personal feelings.
>
> JUROR BUFFALOE: No. . . . I would have to refuse.
>
> JUROR MASSEY: Well, let me say it like this, when it come [sic] to the death penalty, if someone else does something, if somebody say that, I'm in favor of the death sentence. Sure. But I can't sit there and sign my name to something like that. . . . No. I can't do that.
>
> JUROR BROWN: No. . . . Well, I couldn't determine and just judge and say that I could, you know, give somebody the death penalty. . . . No, I wouldn't [consider the death penalty.]
>
> JUROR CORKEN: . . .I'll make a statement here. All my life I thought I could, but when I really get down to it, I couldn't. I would not be able to vote for the death penalty. That's the truth. . . .

ALTERNATE JUROR BROOKS: I just – I couldn't put anybody to death.

ALTERNATE JUROR HUDSON: I don't think I can do that. . . . I think I would have to stand beside my own personal feelings.

After reviewing the answers of the excluded jurors, we conclude that their answers left "no leeway for rehabilitation." Strouth, 620 S.W.2d at 471; see also Alley, 776 S.W.2d at 517-18. In each instance, either the court or the prosecutor extensively questioned the prospective jurors as to whether they could apply the law to the evidence and consider all forms of punishment in this case. Each juror was consistent in responding that he or she would not impose the death penalty. These jurors met the standard for dismissal. See Hutchinson, 898 S.W.2d at 167. There is no error.

### C. Jasper Case Hypothetical

As additional error within the voir dire process, the Appellant asserts that the trial court erred by prohibiting questioning of potential Juror Clothier with respect to a recent homicide in Jasper, Texas.[14] By using the Jasper case as a hypothetical, the Appellant asserts that he could have determined whether Juror Clothier would be competent, unbiased and impartial in following the law and capable of rendering a capital verdict in a heinous case. The record does not indicate that the trial court prevented defense counsel from questioning Juror Clothier regarding the Jasper, Texas, case.[15]

---

[14]The "Jasper case" involved the dragging death of a forty-nine-year-old African-American man by three members of a white supremacist gang. The African-American man was chained behind a pickup truck and pulled for three miles over a bumpy East Texas road. The incident received nationwide publicity.

[15]During jury selection, the following colloquy occurred between defense counsel Hutton and potential Juror McMillon:

> HUTTON: Well, let's give you an example. There's a real famous one in Texas a couple of days ago. A real horrible case. In a case like that, could you impose the death penalty where somebody –
>
> JUROR McMILLON: Nope.
>
> HUTTON: —drags somebody to death?
>
> JUROR McMILLON: Nope.

After further voir dire examination of potential Juror McMillon, the court excused Juror McMillon for cause and was replaced by potential Juror Clothier. The following voir dire of this juror ensued:

> GENERAL HENDERSON: The law says in Tennessee and I believe the judge will tell you at the end that if the State proves at least one aggravating circumstance beyond a reasonable doubt, and we prove the aggravating circumstance outweighs any mitigating evidence in the case beyond a reasonable doubt, and law says the punishment shall be death. If you find yourself in that situation where we've proven that aggravating circumstance beyond a reasonable doubt, and we've proven that it outweighs any mitigating evidence beyond a reasonable doubt, would you be able to sign your name to a verdict imposing the death penalty?

(continued...)

[15](...continued)

JUROR CLOTHIER: I don't think I could.

GENERAL HENDERSON: Okay. And again, it's not something most people think about in their ordinary course of life. You understand that under certain circumstances the law says the punishment shall be death?

JUROR CLOTHIER: Yes.

GENERAL HENDERSON: If you were a part of the jury and found this was one of those cases where the law . . . says the punishment shall be death, would you be able to follow that law and sign your name to the verdict or would you stand by your own personal feelings and say, no. I can't do that. . . .

JUROR CLOTHIER: Even though I felt like that maybe death was deserved in that specific case, because of my religious beliefs, I'm not sure that I could actually sign – sign something to put someone else to death.

GENERAL HENDERSON: And that's why I bring it up. A lot of people say sometimes they think that they're in favor of the death penalty or that they think it's a good thing, but in Tennessee we require all twelve jurors to sign their name to a piece of paper sentencing the defendant to death by electrocution. And we're looking for twelve people who can do that . . . . [D]o you think you can do that?

JUROR CLOTHIER: I don't know that I can in this case. . . . [N]o. I can not.

GENERAL HENDERSON: Is there anything about this case, would it make any difference what case it was?

JUROR CLOTHIER: I don't know . **I mean they brought up the Jasper, Texas, thing. I think that's terrible. And I think that person probably does deserve death. But I don't know that if I was on that jury that I could sign it.**

. . .

THE COURT: Mr. Hutton, let me let you address this juror.

MR. HUTTON: Ms. Clothier, I don't want to sound like a tape recorder. . . but I think it's more important that jurors ultimately realize that they are the judges. Okay? The State never tells you, you must impose the death penalty. . . . Unless you personally believe that an aggravator found by all of you outweighs any mitigation that you find. The mitigation doesn't have to be proved by everybody. Anything put forth in the evidence that you believe is mitigating, you have the right as a juror to weigh against what the State had proved as an aggravator.

. . .

So my question is, can you think of a case, **where like the Jasper murder cas**e, where you could do that? Where you could find, well, this is a horrible crime. It's a horrible murder. There's nothing I find that's mitigating. And therefore, I could give the death sentence. And I mean, it doesn't have to be every case. Doesn't have to be many cases. The question is, can you think of a possibility? **Say the Jasper cas**e. Or you know, if a close relative were murdered. . . .

(continued...)

Indeed, the record reveals that Juror Clothier considered the Texas case when formulating her responses to General Henderson. Additionally, defense counsel did include the Jasper, Texas, reference in his questioning of the potential juror. Thus, it is unclear how the court denied defense counsel from making reference to the Jasper, Texas, hypothetical. This claim is without merit.

### D. Examination as to Juror's Belief in the Bible

Finally, within his many claims regarding the impaneling of an impartial jury, the Appellant claims that "[t]he trial court committed error in refusing to allow questioning of whether prospective Juror Scott's belief in the Bible would impact her ability to render a fair decision." During voir dire examination, potential Juror Scott stated, "Well, all the decisions I make are based upon the Bible, because I believe it to be the truth." Juror Scott continued to explain, "I believe that in certain circumstances [the death penalty] is warranted." She added that her religious beliefs would not affect her decision regarding the Appellant. Defense counsel then inquired:

> . . . Can you put aside your beliefs in the Bible, and the Bible as you believe it, I'm not challenging that. I respect everybody's opinion on that. Can you put that aside in this case or after hearing the proof, do you have a belief that when you go back in the jury room somehow what's in the Bible is going to impact the decision that you give to Mr. Austin in this case?

The State objected and the court sustained, holding "You can ask their general philosophy. I think the Constitution would prohibit you from inquiring into religious preferences." Under the authority of Morgan v. Illinois, 504 U.S. 719, 112 S. Ct. 2222 (1992), the Appellant contends that, since Juror Scott stated that everything she does is guided by the Bible, he had an absolute right to determine whether or not her religious beliefs in the Bible would affect her decision in the present case.

The right to question venire members is not unlimited, but must, of necessity, be limited to inquiries that are material and relevant to the specific case being tried. See generally Layman v. State, 429 S.W.2d 832, 836 (Tenn. Crim. App. 1968). Generally, a trial court may properly limit inquiry into a venire member's religious beliefs in those instances where religious issues are expressly presented in the case, where a religious organization is a party to the litigation or where the inquiry is a necessary predicate to the exercise of peremptory challenges. See generally Yarborough v. United States, 230 F.2d 56, 63 (4 th Cir. 1956), cert. denied, 351 U.S. 969, 76 S. Ct. 1034 (1956); Brandborg

---

[15](...continued)

(Emphasis Added). At this time, the State objected to defense counsel's voir dire asserting that "[t]ha t's an impossible hypothetical. If a close relative were murdered, she wouldn't be on the jury." Th e court then re gained control of voir dire and asked M s. Clothier, "Would you be open to considering all forms of punishment?" Juror Clothier replied affirmatively. General Henderson, again, posed the question to Clothier as to whether she would be able to sign her name to a verdict imposing death. Clothier replied that she could not. The juror was then excused.

v. Lucas, 891 F. Supp. 352 (E.D. Tex. 1995); State v. Via, 704 P.2d 238, 248 (Ariz. 1985), cert. denied, 475 U.S. 1048, 106 S. Ct. 1268 (1986); Coleman v. United States, 379 A.2d 951, 954 (D.C. Ct. App. 1977); Rose v. Sheedy, 134 S.W.2d 18, 19 (Mo. 1939); Corey Schriod Smith v. State, No. CR-95-0205 (Ala. Crim. App. Aug. 25, 2000). Indeed,

> As to religion, our jury selection system was not designed to subject prospective jurors to a catechism of their tenets of faith, whether it be Catholic, Jewish, Protestant, or Mohammedan, or to force them to publicly declare themselves to be atheists. Indeed, many a juror might have a real doubt as to the particular religious category into which they could properly place themselves.

United States v. Barnes, 604 F.2d 121, 141 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S. Ct. 1833 (1980).

The trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. In the present case, we conclude that the trial court properly restricted counsel from delving into the juror's religious beliefs. The prospective juror previously stated that her religious beliefs would not affect her decision in the present case. Accordingly, any foray into her religious convictions was irrelevant as having no direct relationship to the parties involved in the matter or the issues presented at re-sentencing. Additionally, any error by the court in restricting voir dire is negated by the Appellant's use of a peremptory strike against potential juror Scott coupled with his failure to exercise all peremptory challenges. See generally Ross v. Oklahoma, 487 U.S. 81, 83-87, 108 S. Ct. 2273, 2276-2277, reh'g denied, 487 U.S. 1250, 109 S. Ct. 11 (1988) (defendant's use of peremptory challenge against challenged prospective juror waived complaint against juror on appeal). Accordingly, the Appellant is not entitled to relief as to this claim.

### III.
### [Deleted: Refusal to Admit Hearsay Into Evidence]

### IV.
### Admission of Testimony of the Appellant's Prior Threats of Violence

Marilyn Lee Pryor, an employee at The Golden Cue in May 1977, testified regarding statements made by the Appellant shortly after the April raid. Specifically, she stated that the Appellant remarked to her that "[Watkins] should have his brains shot out." Additionally, she described events occurring immediately after the murder of Julian Watkins. Ms. Pryor related that she was questioned by Memphis Police Officers regarding the Appellant's "whereabouts" and was informed that she would be subpoenaed to come to court to give a statement. Later that same day, the Appellant told her not to worry about the subpoena. The following morning the Appellant arranged for Ms. Pryor to be driven to her home in Mississippi. The next day, unbeknownst to the Appellant, Ms. Pryor returned to Memphis, gave her statement, and returned to Mississippi.

The State then inquired as to whether she had spoken to the Appellant after providing authorities with her statement in 1977. Over defense objection, Ms. Pryor testified that, when she later told the Appellant that "[she] had testified for the State," [provided a statement], the Appellant "told [her] that [she] was a stupid, cold, bitch and that [she] should have been killed, too. . . ." The Appellant now complains that admission of this testimony was error. Specifically, he contends that

> [s]uch threats would be inadmissible under Rule 608(b) of the Tennessee Rules of Evidence since such conduct is not probative of truthfulness or untruthfulness. Furthermore, the testimony was highly prejudicial because allowing the jury to hear that Mr. Austin had previously threatened her would only inflame the jury and the concern substantially outweighed any probative value the testimony had.

The Appellant's reliance on the Rules of Evidence is misplaced. First, we again acknowledge that, at a capital re-sentencing hearing,

> evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background, history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. **Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence,** provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

TENN. CODE ANN. § 39-2404(c). Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt. See generally NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[13] (4 th ed. 2000) (citing State v. Maddox, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997); Tillery v. State, 565 S.W.2d 509 (Tenn. Crim. App. 1978)). At the basis of the Appellant's mitigation theory was evidence tending to negate his culpability for the offense. Thus, testimony relating that the Appellant would have preferred that Ms. Pryor be killed, rather than provide testimony relating to activities surrounding the murder of Julian Watkins, was evidence probative to rebut the defense theory of mitigation and to establish residual doubt of the Appellant's guilt. Accordingly, the testimony was properly admitted and we find no error.

## V.
## Cross-examination of Witness Levi Haywood

During the re-sentencing hearing, defense counsel presented the testimony of Levi Haywood, who testified that he had met Terry Casteel at the Shelby County Jail. Casteel informed Haywood that he had been beaten and coerced into testifying against the Appellant. Haywood continued to state that Casteel regretted his role as a prosecuting witness and asserted that the Appellant had not been involved in the murder. On cross-examination, Haywood admitted that he had previously "omitted" that Casteel had been beaten by the police in his recitation of his dealings with Casteel. The examination continued to reveal that Casteel was considered to be a "snitch" because he had implicated the Appellant. The following colloquy ensued:

GENERAL CAMPBELL: What happens to snitches, Mr. Haywood?

HAYWOOD: That all depends.

GLANKLER: Object.

COURT: Overruled.

GENERAL CAMPBELL: What happens to snitches in the jail?

HAYWOOD: It all depends. I wasn't a snitch and I almost got stabbed by a plumber because an officer said that I killed somebody.

GENERAL CAMPBELL: What happens to a snitch, Mr. Haywood, in prison?

HAYWOOD: In prison?

GENERAL CAMPBELL: Yeah.

HAYWOOD: They may get beat up. They may get put on segregated lock up. It all depends.

GENERAL CAMPBELL: They may get killed, too?

HAYWOOD: Yeah, they might.

The Appellant now contends that the trial court erred in permitting into evidence Haywood's testimony about "[w]hat happens to snitches in the jail." Specifically, he contends that the testimony is "speculative and irrelevant" and should not have been admitted into evidence.

Again, at a capital sentencing hearing,

> evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background, history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and **any evidence tending to establish or rebut any mitigating factor**s. **Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence,** provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

TENN. CODE ANN. § 39-2404(c). Under these criteria, the State may properly introduce reliable testimony probative to rebut any mitigating circumstance advanced by the defense. In the present case, the Appellant sought to introduce "residual doubt" evidence to rebut the murder for remuneration aggravating circumstance.[16] Specifically, he presented the testimony of Levi Haywood to relate that Terry Casteel had only implicated the Appellant in the murder because Casteel was physically intimidated by the police. The State then sought to explain Casteel's motive in explaining to Haywood and other inmates as to why he testified against the Appellant. Evidence regarding the treatment of "snitches" was, therefore, probative in explaining Casteel's differing justification of his testimony to Haywood.[17] Accordingly, we find no error in permitting the introduction of such evidence. This claim is without merit.

## VI.
## Fifth Amendment Rights of Jack Charles Blankenship

Prior to the re-sentencing hearing, defense counsel obtained a writ of habeas corpus ad testificandum to bring Jack Charles Blankenship to Memphis to testify. Upon arriving in Memphis, Blankenship consulted with his attorney and was advised to assert his Fifth Amendment privilege against self-incrimination. At the re-sentencing hearing, Blankenship invoked his Fifth Amendment privilege upon being called to the stand. The trial court found that Blankenship's Fifth Amendment privilege had expired in the present case because his conviction for his criminal involvement in Watkins' murder was final and he was not subject to further prosecution. As such, the court ordered

---

[16]"Residual doubt" evidence is not "a fact about the defendant or the circumstances of the crime, but is a state of mind somewhere between reasonable doubt and absolute certainty of guilt." Teague, 897 S.W.2d 253 (citing State v. Bigbee, 885 S.W.2d 797, 813 (Tenn. 1994)). "Residual doubt" evidence is admissible at a capital re-sentencing hearing where the evidence relates directly to a mitigating factor or rebuts the State's proof as to an aggravating factor. Teague, 897 S.W.2d at 253 ("[p]rohibiting evidence regarding the extent to which the defendant did or did not participate in the commission of the crime would defeat in large measure the defendant's right to present evidence denying, explaining or rebutting evidence of aggravating circumstances).

[17]The test for admissibility is not whether the evidence tends to prove the defendant did or did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances. See Teague, 897 S.W.2d at 252.

Blankenship to testify. Blankenship proceeded to testify, corroborating the testimony of Terry Casteel and recanting his previous testimony which exculpated the Appellant. The Appellant now contends that the court unconstitutionally compelled Blankenship's testimony.

A criminal defendant lacks standing to complain of the violation of a third party's Fifth Amendment privilege against self-incrimination. See, e.g., United States v. Tribunella, 749 F.2d 104, 106 n.1 (2d Cir. 1984); United States v. Minor, 398 F.2d 511, 513 (2d Cir. 1968); People v. Jenkins, 997 P.2d 1044, 1089 (Cal. 2000), petition for writ of cert. filed, (Oct. 24, 2000); People v. Homes, 654 N.E.2d 662, 668 (Ill. App. 1995). The Fifth Amendment privilege is personal and cannot be vicariously asserted. Rogers v. United States, 340 U.S. 367, 371, 71 S. Ct. 438, reh'g denied, 341 U.S. 912, 71 S. Ct. 619 (1951). The Appellant was not compelled to testify; Blankenship was. Only Blankenship, and not the Appellant, may assert a violation of the privilege. Whatever the merit of the Appellant's claim may be, the Appellant has no standing to assert the alleged violation of the Fifth Amendment privilege of Blankenship. Accordingly, we need not address the merits of the Appellant's complaint.

## VII.
### [Deleted: Introduction of Victim Impact Evidence]

## VIII.
### Prosecutorial Misconduct during Closing Argument

In his next argument, the Appellant contends that the State violated his right to a fair trial by arguing matters not in evidence during closing argument. Specifically, he asserts that the State:

> crafted a blatantly false motive for Austin to kill Watkins, by arguing to the jury that [the Appellant] would have lost his amusement license and thus could no longer operate The Golden Cue. However, [the Appellant] never held an amusement license, and there was put forward no proof by the State that he ever did have such a license.

As asserted by the State, the Appellant failed to make a contemporaneous objection to the prosecutor's statements during closing argument. See State v. Green, 947 S.W.2d 186 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App.1992) (failure to object to prosecutor's alleged misconduct during closing argument waives later complaint). The failure to object to the prosecutor's statements results in waiver on appeal. See generally State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)). Because the issue was procedurally defaulted, we decline review of its merits.

## IX.
## Refusal to Instruct Jury as to Sentences Received by Co-Defendants

The Appellant argues that numerous constitutional rights were violated by virtue of the trial court's failure to instruct the jury to consider the sentences received by co-defendants Terry Casteel and Jack Charles Blankenship as non-statutory mitigating circumstances.[18] The trial court refused to so instruct the jury, finding:

> . . . [U]nder the statutory definition of accessory before the fact, it says, the sentence may be, and I'm paraphrasing, I don't even have it in front of me, may be life or death. And then that extra line follows that. It says, regardless of punishment for the principal or other people involved. And as a result of that statutory scheme, I felt it's inappropriate to bring that up. And as a result, I did not put it in there.[[19] ]

Conceding that the statute provides that an accessory may receive a more severe sentence than the principal, the Appellant maintains that this fact does not preclude consideration of the punishments received by co-defendants as a mitigating factor in determining the appropriate sentence for an accessory before the fact. In support of his position that sentences received by equally culpable defendants be instructed as a mitigating circumstance, the Appellant relies upon our supreme court's opinion in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), and the fact that the federal capital sentencing provisions expressly provide that the non-death sentences received by equally culpable defendants may be considered as a mitigating factor. See 18 U.S.C.S. § 3592(a)(4) (Law. Co-op. 2000 Supp.).

In State v. Odom, our supreme court held that, although TENN. CODE ANN. § 39-2-204(e)(1)(1991), requires trial courts "to instruct the jury on any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, " "neither the United States Constitution nor the Tennessee Constitution requires the trial judge to read or submit non-statutory mitigating circumstances to the jury." Id. at 28-30. The trial court, additionally, noted that the law prior to 1989, TENN. CODE ANN. § 39-2-203(e) (1982), did not require that non-statutory mitigating factors be expressly instructed. Odom, 928 S.W.2d at 29 (citations omitted); see also Smith, 993 S.W.2d at 32, (Appendix) (Odom's interpretation of TENN. CODE ANN. § 39-2-204(e)(1) not applicable to sentence imposed under prior sentencing law).

---

[18]The record shows that co-defendant Casteel received a twenty-year sentence and co-defendant Blankenship received a sentence of life imprisonment.

[19]TENN. CODE ANN. § 39-2407 provides:

> Any person tried and convicted as an accessory before the fact of murder in the first degree shall be punished by life imprisonment or by death under the provisions of Tennessee Code Annotated, Sections 39-2402, 39-2404, 39-2405 and 39-2406, and said trial and sentence shall not depend on when or if the principal is convicted nor on the punishment actually imposed on said principal.

Because the offense for which the Appellant was convicted was committed in 1977, the supreme court's interpretation of TENN. CODE ANN. § 39-2-204(e)(1), involving post-1989 capital convictions, has no application to this case. The sentencing law in effect at the time of the offense, *i.e.*,TENN. CODE ANN. § 39-2404 (e), did not require that the jury be instructed as to non-statutory mitigating circumstances.[20] See Smith, 993 S.W.2d at 32 (§ 39-2-203(e) does not require instruction on non-statutory mitigating circumstances).[21] Accordingly, we conclude that the trial court did not err in refusing to instruct the jury as to the sentences received by the Appellant's co-defendants as such an instruction was neither statutorily nor constitutionally required.[22]

## X.
### Refusal to Instruct Jury as to Sentence of Life Without Parole

The Appellant asserts that he was entitled to have the jury instructed as to the sentencing option of life without the possibility of parole. In 1993, the General Assembly amended the capital sentencing statutes to provide for the sentence of life imprisonment without the possibility of parole. State v. Keen, 31 S.W.3d 196, 213 (Tenn. 2000), petition for cert. filed, (Dec. 5, 2000) (citing 1993 Tenn. Pub. Acts ch. 473). It is well established that prior to 1993 the only punishments available for a person convicted of first degree murder were life imprisonment and death. See Keen, 31 S.W.3d at 213; State v. Cauthern, 967 S.W.2d 726, 735 (Tenn. 1998), cert. denied, 525 U.S. 967, 119 S. Ct. 414 (1998); see also State v. Bruce C. Reliford, No. W1999-00826-CCA-R3-CD (Tenn. Crim. App. at Jackson, Oct. 2, 2000). Although the Appellant's offense was committed prior to the effective date of the act, he asserts that he is entitled to an instruction on life without the possibility of parole because his sentencing hearing on remand occurred after the act was passed. Specifically, in support of his position, the Appellant advances the following arguments:

> (1) A sentencing scheme that does not offer a sentence of life without the possibility of parole cannot be relied upon to reflect a properly guided and reasoned decision that death is the most appropriate punishment;

---

[20]TENN. CODE ANN. § 39-2404(e) provides:

> After closing arguments in the sentencing hearing, the trial judge shall include in his instructions for the jury to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances set forth in subsection (i) of this section which may be raised by the evidence at either the guilt or sentencing hearing, or both. These instructions and the manner of arriving at a sentence shall be given in the oral charge and in writing to the jury for its deliberations.

[21]TENN. CODE ANN. § 39-2404(e) is verbatim TENN. CODE ANN. § 39-2-203(e). Thus, the same analysis is applied.

[22]Although we find it unnecessary to address the Appellant's contention that sentences received by co-defendants are a valid non-statutory mitigating circumstance, a determination of whether the circumstance is mitigating would be a cognizable issue had the 1989 Criminal Sentencing Act been applicable. See generally Odom, 928 S.W.2d at 30-32. Additionally, while we take no position as to this determination, the Appellant is correct that under the Federal Death Penalty Act the circumstance that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death" is a statutorily enumerated mitigating factor. 18 U.S.C.S. § 3592(a)(4).

(2) A sentencing scheme that does not permit consideration of life without the possibility of parole infringes upon evolving standards of decency protected by the federal and state constitutions;

(3) A death sentence returned under a sentencing scheme which requires juries to sentence defendants to the death penalty in order to incapacitate the defendants from committing further crimes constitutes excessive punishment; and

(4) Refusal to permit consideration of life without the possibility of parole violates rights to equal protections of the laws.

While we respect the Appellant's arguments in support of this claim, we note that the identical arguments were recently rejected by our supreme court in State v. Keen, 31 S.W.3d at 213-219. Accordingly, as we are bound by the precedent established by the supreme court, we find it unnecessary to revisit the arguments recently dismissed by the court. This claim is without merit.

## XI.
### Refusal to Instruct Jury Regarding Parole Eligibility

During jury deliberation, the jury submitted a question to the court asking "how long is a life sentence and if there is any possibility of parole." After consulting with both the State and defense counsel, the trial judge explained to the jury that, "once a jury starts it s deliberations, the trial judge is extremely limited on his involvement. . . ." The judge continued that he was "not at liberty" to respond to their question and that the law to be applied had already been charged. The jury resumed deliberations at 9:35 a.m. and returned a verdict of death at 1:50 p.m..

The Appellant now complains that, under the authority of Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187 (1994), the trial court's failure to answer the jury's question violated virtually every constitutional right belonging to a capital defendant. As advanced by the State, our supreme court reviewed and rejected this very same argument under almost identical circumstances in State v. Bush, 942 S.W.2d 489, 503 (Tenn.), cert. denied, 522 U.S. 953, 118 S. Ct. 376 (1997).

In State v. Bush, the jury sent a note to the court fifteen minutes after deliberations began asking, "How many years does the [defendant] serve if he gets life imprisonment and how long before parole?" The trial court instructed the jury, "parole eligibility is not an issue in a capital case . . . ." In approving the trial court's response, our supreme court noted that, in Simmons, the Supreme Court held that due process only required an instruction that the defendant is parole ineligible "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole." Bush, 942 S.W.2d at 503 (citing Simmons, 512 U.S. at 155-156, 114 S. Ct. at 2190). The Supreme Court added that the Court would not "second-guess the refusal of a State to allow proof, instruction, or argument to the jury on the availability of parole" "[i]f parole *is* an option for a defendant sentenced to life imprisonment." Bush, 942 S.W.2d at 503 (citing Simmons, 512 U.S. at

168-169, 114 S. Ct. at 2196; see also Simmons, 512 U.S. at 175-177, 114 S. Ct. at 2200 (O'Connor, J., concurring) (parenthetical omitted)). Under the reasoning provided in Simmons, our supreme court held that "[s]ince Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, Simmons does not require that the jury be given information about parole availability." Bush, 942 S.W.2d at 503. This position is supported by other decisions of the court "holding that the after-effect of a jury's verdict, such as parole availability, is not a proper instruction or consideration for the jury during deliberations."[23] Bush, 942 S.W.2d at 503 (citing Caughron, 855 S.W.2d at 543; State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), aff'd by, 501 U.S. 808, 111 S. Ct. 2597 (1991) (internal footnote omitted)). This issue is without merit.

## XII.
## Whether Aggravator (i)(4) Violates State v. Middlebrooks

The Appellant was found guilty of accessory before the fact to first degree murder. An "accessory before the fact" is "[a]ny person who shall feloniously move, incite, counsel, hire, command, or procure any other person to commit a felony. . . ." TENN. CODE ANN. § 39-107. In imposing a sentence of death in this case, the jury found that "[t]he defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration." TENN. CODE ANN. 39-2404(i)(4). The Appellant now contends that the evidence used to convict him as an accessory before the fact to first degree murder duplicated that used to support the aggravating factor in TENN. CODE ANN. § 39-2404(i)(4) (employing another to commit the murder for the promise of remuneration). Relying upon State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), the Appellant asserts that the duplication of facts to support both the conviction and sentence does not achieve the constitutionally required "narrowing" of death eligible defendants. See Zant v. Stephens, 462 U.S. 862, 877, 103 S. Ct. 2733 (1983) (aggravating factor must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder").

In State v. Middlebrooks, 840 S.W.2d at 346, our supreme court held that, when a defendant is convicted of felony murder, the aggravating circumstance set out in TENN. CODE ANN. § 39-13-204(i)(7)(murder committed while committing certain enumerated felonies) does not narrow the class of death eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, § 16 of the Tennessee Constitution "because it duplicates the elements of the offense." See State v. Hall, 958 S.W.2d 679, 692 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S. Ct. 2348 (1998). The court reasoned that all participants in a felony murder, regardless of the degree of culpability, enter the sentencing stage of the trial with at least one aggravating factor against

_____

[23]The Bush court did expressly recognize, however, the new sentencing option of life without the possibility of parole effective July 1, 1993. See Bush, 942 S.W.2d at 503 n.8. The court also acknowledged another part of the legislative enactment requiring the jurors now be instructed "that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five full calendar years of such sentence." Id. In addition, jurors must be informed that "a defendant who receives a sentence of imprisonment for life without possibility of parole shall never be eligible for release on parole." Id. (citing TENN. CODE ANN. § 39-13-204(e)(2)).

them because the aggravating factor duplicates the elements of the offense. <u>Middlebrooks</u>, 840 S.W.2d at 343 (quotation omitted).

The Appellant applies this same analysis to the (i)(4) aggravating factor when the conviction is based upon "accessory before the fact." The State acknowledges that this court, in the Appellant's fourth petition for post-conviction relief, rejected this identical issue and argues that, although not the "law of the case," this court should apply the same analysis in this direct appeal. <u>See</u> <u>Richard H. Austin v. State</u>, No. 02C01-9310-CR-00238 (Tenn. Crim. App. at Jackson, May 3, 1995), perm. to appeal denied, (Tenn. Nov. 6, 1995). The Appellant responds that this court misapplied the supreme court's decision in <u>State v. Stephenson</u> in determining that the Appellant had no <u>Middlebrooks</u> issue. Specifically, he asserts that the <u>Stephenson</u> analysis is not germane to the present issue because the <u>Stephenson</u> court based its decision on the criminal responsibility statute, a different underlying statute than this court is faced with today. After re-examination of the issue, we remain convinced that our previous rationale is correct and the same analysis applies.

In <u>State v. Stephenson</u>, 878 S.W.2d at 557, the defendant was convicted of first degree murder by employing another to kill his wife. Stephenson's conviction was based on his role in the killing under the criminal responsibility statute, TENN. CODE ANN. § 39-11-402(2) (1991), and the death sentence was based solely on the aggravating factor involving murder for remuneration or promise of remuneration. TENN. CODE ANN. § 39-13-204(i)(4) (1991). The defendant claimed that the constitutionally required narrowing of death eligible offenders was not achieved because of the duplication of facts to support the conviction and the death sentence. Our supreme court disagreed, noting that the defendant stood convicted of first degree premeditated murder, which is defined as an "intentional, premeditated and deliberate killing of another." TENN. CODE ANN. § 39-13-202(a)(1) (1991). The conviction was based on the criminal responsibility statute, TENN. CODE ANN. § 39-11-402(2), which provides:

> A person is criminally responsible for an offense committed by the conduct of another if:
>
> Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . .

The supreme court concluded that "the statutory aggravating circumstance found by the jury is a proper narrowing device because it provides a 'principled way in which to distinguish' the cases in which the death penalty is imposed from the many cases in which it is not. . . ." <u>Stephenson</u>, 878 S.W.2d at 557. The court reasoned:

> The aggravating circumstance - the defendant employed another to commit the murder for remuneration or the promise of remuneration - does not duplicate the elements of the offense, even incorporating the

criminal responsibility statutes. Constitutional narrowing is accomplished because at the sentencing hearing, the State was required to prove that this defendant hired someone to kill his wife, or promised to pay someone to kill his wife. *Obviously, not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statutes has also hired another or promised to pay another to commit the murder.* Thus, the aggravating circumstance found by the jury in this case narrows the class of death-eligible defendants as required by State v. Middlebrooks, *supr*a.

Id. at 557 (emphasis added).

As noted in this court's decision in Richard H. Austin v. State, No. 02C01-9310-CR-00238, the Appellant's conviction was premised on a theory of criminal responsibility for the conduct of another, although not expressly designated as such at the time.[24] Specifically, the Appellant was convicted of accessory before the fact to first degree murder. An accessory before the fact" is "[a]ny person who shall feloniously move, incite, counsel, hire, command, or procure any other person to commit a felony. . . ." TENN. CODE ANN. § 39-107. Applying the Stephenson rationale, not every person who is convicted as an accessory before the fact to first degree murder has also hired another or promised to pay another to commit the murder.[25] Accordingly, as in Stephenson, we conclude that the aggravating factor enumerated in TENN. CODE ANN. § 39-2404(i)(4) achieves the constitutionally required narrowing of death eligible defendants even where the conviction is based on the defendant's role as an accessory before the fact. See Owens v. State, 13 S.W.3d 742, 764-765 (Tenn. Crim. App. 1999), perm. to appeal denied, (Tenn.), cert. denied, – U.S.–, 121 S. Ct. 116 (2000). For these reasons, the Appellant is denied relief on this claim.

---

[24]Under the law existing at the time of this offense, an accessory before the fact was deemed a principal offender and punished as such. See TENN. CODE ANN. § 39-108. This code section, in addition to TENN. CODE ANN. § 39-109 (defining aiders and abettors), was subsequently repealed and replaced by the criminal responsibility statute. See TENN. CODE ANN. § 39-11-402. Indeed, "[s]ubdivision (2) [of TENN. CODE ANN. § 39-11-402] sets forth the conduct of defendants formerly known as accessories before the fact and aiders and abettors." Sentencing Commission Comments, TENN. CODE ANN. § 39-11-402.

[25]Additionally, we acknowledge that the Appellant raised the identical claim in his federal habeas corpus petition. The District Court for the Middle District of Tennessee rejected the claim, holding that the Appellant's "allegation of a Middlebrooks violation fails to present a cognizable federal claim." Austin v. Bell, 938 F.Supp. 1308, 1326 (M.D. Tenn. 1996). Nonetheless, the district court proceeded to address the issue on its merits, concluding

[a]ccording to the law in effect at the time of Julian Watkins' murder, an accessory before the fact was deemed a principle offender and punished as such. See TENN. CODE ANN. § 39-108 *(repealed* 1989). Because not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statute has also hired another person to commit the murder, however, the aggravating circumstance that Petitioner's jury found did narrow the class of death-eligible defendants in accordance with Middlebrooks. Stephenson, 878 S.W.2d at 557. Therefore, the aggravating circumstance that Petitioner's jury found did narrow the class of death-eligible defendants in accordance with Middlebrooks.

Austin v. Bell, 938 F.Supp. at 1327.

# XIII.
## Propriety of Court's Refusal to Impose Life Sentence Due to Twenty-year Delay

The Appellant asserts that the twenty plus years delay in imposing the death penalty has eviscerated any justification for carrying out the sentence of death; therefore, execution of this sentence at this point would constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. The United States Supreme Court declined to review a similar issue in Lackey v. Texas, 514 U.S. 1045, 115 S. Ct. 1421 (1995), petition for reh'g denied, 520 U.S. 1183, 117 S. Ct. 1465 (1997) (whether executing a prisoner who has already spent seventeen years on death row violates the Eight Amendment's prohibition against cruel and unusual punishment). Notwithstanding, Justice Stevens, joined by Justice Breyer, filed a memorandum, emphasizing that a denial of certiorari was not a ruling on its merits and noting his belief that this concern should be further explored. Lackey v. Texas, 514 U.S. at 1045, 115 S. Ct. at 1421. Specifically, Justice Stevens recognized that the delay in the execution of judgments imposing the death penalty frustrates the two principal social purposes of the penalty, *i.e.*, retribution and deterrence. Lackey, 514 U.S. at 1045, 115 S. Ct. at 1421 (Stevens, J., respecting denial of certiorari). In so stating, Justice Stevens invited the state and federal courts to "serve as laboratories in which the issue [may] receive further study before it is addressed by this Court." Id. at 1045, 115 S. Ct. at 1421 (citing McCray v. New York, 461 U.S. 962, 963 103 S. Ct. 2438, 2439 (1983)).

The issue was again presented to the Court in Knight v. Florida, 528 U.S. 990, 120 S. Ct. 459 (1999). Justice Thomas, writing separately in the court's denial of certiorari, opined:

> . . .I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed. Consistency would seem to demand that those who accept our death penalty jurisprudence as a given also accept the lengthy delay between sentencing and execution as a necessary consequence. . . . It is incongruous to arm capital defendants with an arsenal of "constitutional" claims with which they may delay their executions, and simultaneously to complain when executions are inevitably delayed.
> . . .

Knight v. Florida, _U.S. at __, 120 S. Ct. at 459-60 (Thomas, J., concurring in denial of certiorari) (citations omitted). Justice Thomas, notably, revisited Justice Stevens previous invitation for the lower courts to serve as "laboratories" in which the viability of this claim could receive further study. He emphasized that, since Justice Stevens' invitation, the lower courts have "resoundingly rejected the claim as meritless." Id. at 461, 120 S. Ct. at 461 (citing People v. Frye, 959 P.2d 183, 262 (Cal. 1998), cert. denied, 526 U.S. 1023, 119 S. Ct. 1262 (1999); People v. Massie, 967 P.2d 29, 44-45

(Cal. 1998), cert. denied, 526 U.S. 1113, 119 S. Ct. 1759 (1999); Ex parte Bush, 695 So.2d 138, 140 (Ala. 1997); State v. Schackart, 947 P.2d 315, 336 (Ariz. 1997), cert. denied, 525 U.S. 862, 119 S. Ct. 149 (1998); Bell v. State, 938 S.W.2d 35, 53 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 827, 118 S. Ct. 90 (1997); State v. Smith, 931 P.2d 1272, 1287-88 (Mont. 1996), cert. denied, 522 U.S. 965, 118 S. Ct. 410 (1997); White v. Johnson, 79 F.3d 432, 439-40 (C.A.5), cert. denied, 519 U.S. 911, 117 S. Ct. 275 (1996); Stafford v. Ward, 59 F.3d 1025, 1028 (C.A. 10 1995)). A panel of this court similarly dismissed the claim without review. See State v. Charles Eddie Hartman, No. M1998-00803-CCA-R3-DD (Tenn. Crim. App. at Nashville, May 17, 2000).

After consideration of the Appellant's claim, we perceive no constitutional violation under either the federal or the Tennessee constitution. We remain unconvinced that neither this state's capital sentencing law nor the accompanying subsequent appellate review of a capital conviction was enacted with a purpose to prolong incarceration in order to torture inmates prior to their execution. As in most cases, the delay in the instant case was caused in large part by numerous appeals and collateral attacks lodged by the Appellant. This issue is without merit.

## XIV.
## Constitutional Challenges to Death Penalty

The Appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. The challenges raised by the Appellant have been previously examined and rejected by case law decision. The body of law upholding the constitutionality of Tennessee's death penalty provisions, specifically, that rejecting the claims currently raised by the Appellant, is recited as follows:

> 1. Tennessee's death penalty statutes meaningfully narrow the class of death eligible defendants; specifically, the statutory aggravating circumstances set forth in TENN. CODE ANN § 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) provide such a meaningful basis for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.[26] See State v. Vann, 976 S.W.2d 93, 117-118 (Tenn. 1998) (Appendix), cert. denied, 526 U.S.1071, 119 S. Ct. 1467 (1999); Keen, 926 S.W.2d at 742.

> 2. The death sentence is not capriciously and arbitrarily imposed in that

> > (a) The prosecutor is not vested with unlimited discretion as to whether or not to seek the death penalty. See State v. Hines,

---

[26]We note that factors (i)(2), (i)(5), (i)(6), and (i)(7) do not pertain to this case as they were not relied upon by the State. Thus , any individual claim with respect to these factors is without merit. See, e.g., Hall, 958 S.W.2d at 715; Brimmer, 876 S.W.2d at 87.

919 S.W.2d 573, 582 (Tenn. 1995), <u>cert</u>. <u>denied</u>, 519 U.S. 847, 117 S. Ct. 133 (1996).

(b) The death penalty is not imposed in a discriminatory manner based upon economics, race, geography, and gender. <u>See</u> <u>Hines</u>, 919 S.W.2d at 582; <u>Brimmer</u>, 876 S.W.2d at 87; <u>Cazes</u>, 875 S.W.2d at 268; <u>Smith</u>, 857 S.W.2d at 23.

(c) Standards or procedures for jury selection exist to insure open inquiry concerning potentially prejudicial subject matter. <u>See</u> <u>Caughron</u>, 855 S.W.2d at 542.

(d) The death qualification process does not skew the make-up of the jury and does not result in a relatively prosecution prone guilty-prone jury. <u>See</u> <u>State v. Teel</u>, 793 S.W.2d 236, 246 (Tenn.), <u>cert</u>. <u>denied</u>, 498 U.S. 1007, 111 S. Ct. 571 (1990); <u>State v. Harbison</u>, 704 S.W.2d 314, 318 (Tenn.), <u>cert</u>. <u>denied</u>, 470 U.S. 1153, 106 S. Ct. 2261 (1986).

(e) Defendants are not unconstitutionally prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e*., the cost of incarceration versus cost of execution, deterrence, method of execution. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 86-87; <u>Cazes</u>, 875 S.W.2d at 268; <u>Black</u>, 815 S.W.2d at 179.

(f) There is no constitutional violation when the jury is instructed that it must agree unanimously in order to impose a life sentence, and is not told the effect of a non-unanimous verdict. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Cazes</u>, 875 S.W.2d at 268; <u>Smith</u>, 857 S.W.2d at 22-23.

(g) Requiring the jury to agree unanimously to a life verdict does not violate <u>Mills v. Maryland</u> and <u>McKoy v. North Carolina</u>. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Thompson</u>, 768 S.W.2d at 250; <u>State v. King</u>, 718 S.W.2d 241, 249 (Tenn. 1986), <u>superseded</u> <u>by</u> <u>statute</u> <u>as</u> <u>recognized</u> <u>by</u>, <u>Hutchinson</u>, 898 S.W.2d at 161.

(h) The jury is required to make the ultimate determination that death is the appropriate penalty. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Smith</u>, 857 S.W.2d at 22.

(i) The defendant is not denied closing argument in the penalty phase of the trial. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

3. The appellate review process in death penalty cases is constitutionally adequate. See Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." See State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

Based upon the above case decisions, the appellant's constitutional challenges to Tennessee's death penalty statutes are rejected.

## XV.
### [Deleted: Proportionality of Sentence]

### Conclusion

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the sentence of death imposed by the trial court.

DAVID G. HAYES, Judge

CONCUR:

JOE G. RILEY, Judge

JOHN EVERETT WILLIAMS, Judge